UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHRISTINE CARROLL, Individually and as Operator of A Fortress,
Plaintiff,

Civil Action No. 3:25-cv-01671-SVN

v.

TOWN OF MANCHESTER; ROGER THRALL; CITY OF HARTFORD; ADVANCED BEHAVIORAL HEALTH, INC.; and NANCY NAVARRETTA, in her Official Capacity as Commissioner of DMHAS,
Defendants.

# FIRST AMENDED COMPLAINT

## I NATURE OF ACTION

1. Plaintiff Christine Carroll brings this action arising from restrictions imposed on recovery residences operated under the name A Fortress in Manchester and Hartford, Connecticut. She alleges disability-based housing discrimination, interference and retaliation under the Fair Housing Act (FHA), discrimination and retaliation under the Americans with Disabilities Act (ADA), and, where supported, violations of the Fourteenth Amendment through 42 U.S.C. § 1983.

## II JURISDICTION AND VENUE

2. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 3613. Venue is proper under 28 U.S.C. § 1391(b), because the challenged conduct occurred in this District.

## III PARTIES AND RECOVERY HOUSING BACKGROUND

3. Carroll operates or formerly operated recovery residences at 101 and 103 Cedar Street, 73 Walnut Street, and a Birch Street property in Manchester, and 510 New Britain Avenue in Hartford. The Birch Street street number is to be verified against property records, because the reviewed materials use inconsistent addresses.

4. A Fortress offers a substance-free, structured group living setting for persons recovering from substance use disorders and for residents with other mental health disabilities. Services include peer support, curfews, group accountability, case management, assistance with employment, transportation, healthcare, education, financial resources and counseling. Carroll contracts with a licensed clinical social worker and a licensed alcohol and drug counselor.

5. Some residents have court-appointed conservators. Carroll alleges that she herself is in recovery from a prior substance use disorder. Plaintiff asserts her own economic and statutory injuries as an operator who provided housing to disabled residents; she does not purport to establish authority to litigate unnamed residents' individual claims merely by identifying them.

6. The recovery houses provide transitional housing to persons recovering from alcohol or drug dependence and other disabled persons, including persons conserved through Connecticut Probate Court.

7. Carroll also maintained her personal residence in Manchester. Apart from that residence, the facilities she owned in Manchester were the four recovery houses at Walnut Street, the two sides of Cedar Street, and Birch Street. The Pages draft identifies Birch Street as 49 Birch Street; the DMHAS affidavit allegations identify 47 Birch Street. The street number remains to be verified.

8. Carroll's case-management services included assistance obtaining employment, transportation to and from employment, healthcare, educational services qualifying residents for employment, financial services and available resources, and mental-health counseling. Residents also participated in family-type outings, including Caribbean cruises.

9. The state-funded initial stay generally covered sixty days. Through case management and assistance finding private-payment resources, approximately ninety percent of residents remained well beyond that period, maintaining stable housing. Carroll alleges that residents could remain as private-pay occupants after funding ended.

10. The Town of Manchester and City of Hartford are Connecticut municipalities. Roger Thrall was a Manchester fire inspector and is sued in his individual capacity on claims for which individual liability is available; official capacity claims against him are duplicative of claims against the Town.

11. Advanced Behavioral Health, Inc. (ABH) administered aspects of DMHAS recovery housing programs. Nancy Navarretta is the DMHAS Commissioner and is sued solely in her official capacity for appropriate prospective relief against ongoing conduct within her authority.

12. Carroll seeks relief directed to the distinct conduct of each defendant. allegations of notice to one agency or municipality do not by themselves establish notice to another.

## IV FACTUAL ALLEGATIONS (MANCHESTER AND ROGER THRALL)

13. Carroll possesses letters from Manchester showing approval of the property dating back to 2018, as well as later letters alleging violations. She describes the recovery residences as nonprofit operations and disputes the Town's effort to treat their rental activity as businesses for taxation.

14. Following discussions about zoning and occupancy in 2023, Carroll used Oath Track to maintain day-to-day occupancy data. She alleges she never thereafter had sixteen people in either Cedar Street house and that company-generated reports of occupied beds compared with total capacity show she never exceeded permitted occupancy.

15. Carroll purchased 73 Walnut Street on October 11, 2023 as part of her response to an administrative corrective action plan, so residents whose ABH basic-needs housing support ended could remain housed rather than be put onto the street or into shelters, while she maintained rotation in the eight funded beds.

16. During renovation of 103 Cedar Street, Carroll moved the men to 101 Cedar Street for approximately one week. Third-floor bedroom floorboards were falling in, and she directed the repair contractor to repair the entire third floor because she recognized the safety concern. She temporarily moved the office to Walnut Street so the case manager could meet residents away from construction noise.

17. Carroll temporarily stored furniture at Walnut Street during the Cedar Street work. When Manchester officials said she could not store the items there, she moved items to Hartford and back to second-floor closets at 101 and 103 Cedar Street. After renovations, contractors replaced furniture but did not restore the office to its former location; they placed a bed in an attic room rather than the intended second-floor location.

18. In or about April 2025 Carroll discovered furniture and an air conditioner in the attic at 101 Cedar Street. She removed them to the closet of a second-floor single room and closed the attic room. She also discovered, after receiving an unusually high electricity bill, that an individual had moved himself into the attic and connected air conditioning without her permission.

19. In April 2025 Thrall visited 73 Walnut Street with a Manchester tax assessor and another municipal official. He claimed to have received a report that twenty persons resided there, without identifying the source.

20. Carroll denied that number and pointed to quarterly water bills of approximately $8 to $9 as evidence inconsistent with the asserted occupancy.

21. Thrall questioned residents about the claimed twenty occupants and, according to Carroll, repeatedly suggested to residents that twenty people lived there.

22. Thrall repeatedly told residents, “you can tell us, twenty people live here,” although Carroll denies twenty people lived at Walnut Street. He also told Carroll “the ops are there,” suggested she “could have gotten rid of some of the residents,” and said he would be back.

23. Thrall told Carroll, among other things, that “it appears there could be twenty people here,” that she might have removed occupants, and that he would return.

24. During the Walnut visit Thrall told Carroll that he did not want a facility “like this” in Manchester. At the time of this statement to Carroll she and Thrall were on the site of the Walnut Street recovery residence and that Thrall did not mention or refer to any other Manchester site.

25. Carroll alleges that, on the same date as the Walnut Street residence visit by Thrall, a Manchester building official and fire captain also stated that the questioned use would have been acceptable if the house were “occupied by a family”. Carroll alleges that the remarks occurred while Manchester officials knew that the premises was a recovery residence.

26. During the same Walnut Street visit, the building and zoning representative objected that a resident had to pass through one bedroom to reach another. While standing on the premises, he said the configuration would be acceptable for a family but not for these residents because they were not members of a family. Carroll also reports that the fire captain present made the same family-based statement. Thrall gave no plausible explanation for opposing this transitional housing.

27. During the inspection of Plaintiff's Manchester recovery residence, a Manchester Building Department official observed that access to one bedroom required passage through another bedroom.

28. While physically present at the premises, the official expressly stated that the bedroom configuration would be acceptable if the occupants were members of a family, but that the same arrangement was unacceptable for the residents of A Fortress because they were not members of a family.

29. At the time of this statement, the official knew that the premises operated as a recovery residence providing housing to unrelated individuals recovering from substance use disorders and other disabilities.

30. The official's statement expressly distinguished between occupancy by a traditional family and occupancy by unrelated individuals residing together in a recovery residence, notwithstanding that the physical configuration of the premises would remain identical.

31. Plaintiff alleges that the official's statement reflected the application of a different occupancy standard to her recovery residence based upon the residents' household composition and their participation in a disability-related recovery housing program.

32. Plaintiff further alleges that the official did not identify any physical difference in the configuration, means of access, or condition of the bedrooms that would arise merely because the occupants were unrelated rather than members of a family.

33. Plaintiff alleges that this differential treatment, considered together with Defendant Thrall's statements expressing opposition to recovery residences in Manchester, the restrictions imposed upon bedrooms, and the subsequent enforcement actions, supports an inference that Defendants' conduct was motivated, at least in part, by the disability related character of Plaintiff's housing operation.

34. Plaintiff alleges that Defendants' application of these restrictions deprived residents of

available housing accommodations and interfered with Plaintiff's ability to provide housing to individuals with disabilities, in violation of 42 U.S.C. §§ 3604(f) and 3617 and Connecticut General Statutes § 46a-64c. Plaintiff further alleges that the official's statement, considered together with Thrall's contemporaneous expression of opposition to a facility "like this," supports an inference that the officials regarded the residents' status as unrelated persons living together in a recovery residence as a reason to subject the property to restrictions that would not have been imposed upon a traditional family occupying the same dwelling.

35. Plaintiff alleges that the conduct of the municipal officials during the Walnut Street inspection contributed to her reasonable belief that Manchester intended to continue targeting the residence, causing her to place the property on the market during the same week and subsequently sell it.

36. Plaintiff alleges that these statements and actions constitute evidence of discriminatory treatment based upon the disability-related character of the recovery residence and are relevant to her claims under the Fair Housing Act, 42 U.S.C. § 3604(f), Connecticut General Statutes § 46a-64c, and the Equal Protection Clause, as enforced through 42 U.S.C. § 1983.

37. Carroll alleges that Manchester municipal officials restricted use of rooms and storage in the Walnut Street house. Therefore, she listed the property for sale during the same week because she feared repeated enforcement and disruption. She subsequently sold the property.

38. She disputes that stored furniture established unlawful sleeping occupancy. She also reports that an unauthorized resident had occupied attic space without her permission and that she removed furniture and an air conditioner when she discovered it.

39. Carroll complained by email to DMHAS contacts and copied Thrall about the Walnut Street encounter, alleged harassment and disability discrimination, and reported a complaint to the Connecticut Attorney General.

40. Plaintiff's July 7, 2025 email to DMHAS, ABH and Thrall described reports that residents believed they could defeat recovery house rules enforcement by making fire complaints.

41. Carroll's email bore the subject "Complaint" and included Thrall among its addressees. It described her July 4, 2025 interaction with resident encounter 474542: she had allowed him an additional month and week beyond the two state-funded months but needed the bed for a new intake. He said he would complain to the state on July 7 about upstairs rooms. She reported that municipal officials had pulled men aside, that residents believed the Town would support them despite rule violations, that she regarded the conduct as ADA discrimination, and that she had complained to the Attorney General.

42. On July 10, 2025 Carroll met with the Manchester assessor about the assertion that her houses had to be reported as businesses notwithstanding rental income reporting on her federal returns and state tax forms.

43. She alleged inconsistent classification and a financial burden.

44. On July 15, 2025 Thrall appeared without advance notice at 101 Cedar Street. Carroll was absent and initially no one admitted him. After he called her, she contacted her program manager, who arranged access through house manager James Brown.

45. Thrall questioned Brown and residents, including persons with conservators who were impaired from comprehending and speaking intelligently with town officials. Carroll reports that

because some resident were frightened as a result of the abrupt questioning, she expressed complaints to ABH/DMHAS and others public entities.

46. Carroll received an account of the July 15 visit from house manager James Brown and later spoke to residents. Residents were upset and in a frenzy after Thrall's questioning; some felt coerced into statements they said were untrue. Some had additional mental disabilities and court-appointed conservators.

47. Plaintiff states that the inspectors refused to consult available bed utilization records nor did they ask to inspect contemporaneous occupancy reports.

48. On July 16 Manchester personnel returned to the Cedar Street duplex. Carroll alleges that Brown was threatened with arrest if he did not allow access to 103 Cedar Street and that access had not been voluntarily authorized.

49. Rooms on the third floor were marked with DANGER notices warning that unauthorized removal could result in criminal prosecution, reducing available bedrooms.

50. Plaintiff received three Notice letters from the Town of Manchester dated July 17, 2025 with regard to the 101 Cedar Street Manchester recovery residence. The three letters were all under **Case Number 2500124** and were pursuant to State Building Code Sections 114, 115 and

51. The notices of violations were all under the signature of the Manchester Building Department official.

52. Plaintiff has never received or been informed by the Town of Manchester or Thrall of any violations other than those contained in the notices for **Case Number 2500124**. Nor has Plaintiff received any notices of violations with regard to the Birch Street or Walnut Street locations.

53. The Town of Manchester supplied a letter dated September 2, 2025 to Plaintiff informing her that, with respect to **Case Number 2500124**, the only violations ever given regarding Plaintiff's operations in Manchester, "the violations had been corrected and the case has been closed."

54. This letter regarding **Case Number 2500124** stating that the case was closed and all violations had been corrected, was supplied by Plaintiff to ABH/DMHAS on or about September 2, 2025.

55. Yet ABH/DMHAS has refused to accept the Manchester letter when it placed a halt on new admissions to Plaintiff's Manchester operations and continues to do so to date.

56. Carroll alleges a conserved resident had arrived from Hartford only two days before the inspection and occupied a legal third-floor bedroom at 103 Cedar Street, not the attic. He nevertheless reported having lived there for two months and that his roommate had been there since November 2024. Closing the entire third floor forced him out of the legal room. Carroll disputes statements attributed to another person who, she says, never lived at the Manchester property.

57. Carroll alleges the caller acknowledged limited English and that several persons questioned had mental-health impairments. She contends their conservators should have given permission and been present to assist before officials relied on their accounts.

58. Carroll disputes Thrall's assertion of numerous prior complaints and alleges she had not previously been given written notice. She reports that a person who called the state fire marshal's office submitted reentry approximately one week later; she connects this account to residents' rumor that complaints could prevent their removal for rule violations.

59. A July 21, 2025 email from ABH's Michelle Masi to DMHAS Director of Managed Services Robert Haswell, DMHAS Behavioral Health Clinical Supervisor Carleen Zambetti, Marisol Cortes, and ABH Executive Director Paul Zakarian described Masi's call with Thrall the preceding Thursday. Thrall said Carroll and her program were known to Manchester officials and that they had received recurring overcrowding complaints.

60. That communication reported that Thrall said there was no immediate health or safety risk because Manchester had "taken care of it" during its Wednesday visit. Thrall reportedly said men had moved to Carroll's Hartford house, which ABH did not cover, and that Manchester had called the Hartford office about perceived overcrowding so Hartford could decide whether to act. Zambetti's November 6, 2025 affidavit acknowledged this communication. Carroll disputes the asserted relocation from Cedar Street to Hartford: she states one person went to Birch Street, everyone else stayed at Cedar Street, and Cedar Street was not full.

61. On July 23 Carroll met Thrall and another Manchester official in the Building Department. They asked her to sign an acknowledgment of a violation; she was told a numerical reference on the document should have been 115 rather than 116, and she signed as requested.

62. The other Manchester official at the July 23 meeting was identified as Seth. Carroll was told that the violation reference should have been 115 rather than 116 and signed the acknowledgment as requested.

63. On July 29 Carroll returned to the Building Department seeking an explanation but could not speak with an official and photographed records.

64. Her counsel notified the Manchester mayor on July 31 of a CHRO complaint. Carroll also submitted a civil rights complaint to the U.S. Department of Justice on or about July 25.

65. Manchester police records from March and July 2025 describe disputes involving residents or former residents at Cedar Street. In the July 4 encounter a program representative presented documents described to police as DMHAS/ABH certifications; the police report records a dispute over a resident's continued occupancy not overcrowding.

66. On August 5, 2025 Manchester's Fire Marshal office called and insisted on access to the Birch Street residence.

67. The August 5 call came at approximately 3:57 p.m. the caller insisted on access and would not take no for an answer. Carroll obtained her call-history report to verify the call originated with Manchester. The Birch Street inspection took place August 6 at approximately 1:30 p.m.

68. Thrall and another official inspected it on August 6. Thrall asked Carroll, "so how is your Hartford location doing?" and commented, "at least [you] don't have to worry about Walnut anymore." Carroll alleges that Thrall had no reason to be aware of her Hartford recovery residence because her operation of the Manchester recovery residences did not require reporting on any other residences that she operated.

69. Plaintiff Carroll also claims that the August 16 inspection was the first time in the four years since she had been running A Fortresses' sober living homes that she did not receive an itemized list of violations and that she still has not received such a list.

70. Carroll alleges that, unlike prior annual inspections, she did not receive an itemized deficiency report following the Birch Street visit and Thrall announced that he would thereafter inspect every six months. The Town's inspection history and reports will identify whether this frequency differed from comparable premises.

71. On August 18, 2025 Carroll asked Manchester Director of Assessment Tami Nomack for required forms for 101 Cedar Street, Birch Street and 73 Walnut Street.

72. On August 19 Nomack explained annual personal-property declarations and income and expense reporting, described the use as an SRO for assessment purposes, and stated that the income-and-expense filing itself did not impose a separate tax bill.

573 Carroll alleges the classification is relevant to the Town's knowledge and its treatment of recovery housing, not that the email itself proves unlawful taxation.

74. Carroll filed a HUD complaint on August 21, 2025 and followed up by email to Lucy Allen on August 22. These dates are retained together with the August 20 HUD correspondence identified below.

75. In September 2025 Manchester informed Carroll that a re-inspection had occurred August 12 and violations had been corrected.

76. Carroll denies that any inspector returned on that date and states that DANGER signs remained in place. She alleges she later regained use of rooms without performing the corrective work the Town had implied was required.

77. Plaintiff received from the Manchester Chief Building Inspector correspondence dated September 2, 2025, concerning case 2500124 at 101 Cedar Street: a Building Department representative supposedly reinspected August 12, "[t]he violation(s) have been corrected and the case has been closed." Carroll denies any August 12 re-inspection.

78. On September 12, 2025 Carroll emailed Seth in the Building Department. Thrall replied that Seth had separated from the Town and copied Chief Building Inspector James Roy.

79. Carroll maintains a software called Oath Track that monitors and maintains occupancy records and contends that the Cedar Street duplex did not exceed authorized occupancy. ABH is well aware of this software utilized by Carroll in that she received extra points from them for having such software to keep track of clients/residents.

80. Carroll also alleges that inspectors did not request those records and that beds or stored furnishings were mistaken for proof of occupants.

81. Carroll disputes the assertion that only twenty-two beds were allowed. She states ABH told her she could be one over on each Cedar Street side, allowing six at 101 and six at 103, or twelve total, and that only ten people were actually there.

82. Carroll alleges, upon information and belief, that Manchester did not conduct similarly frequent inspections of comparable non-disabled group homes or multi-tenant residences based upon her having been told by another sober-house operator in town that the other house held ten persons in a property with a lower authorized occupancy.

83. Carroll alleges that the enforcement deprived disabled residents of rooms, displaced some residents to other A Fortress houses, caused vacancy losses and impaired program operations.

84. Carroll estimated income of approximately $4,560 monthly at Walnut Street and $10,800 monthly at Cedar Street for the relevant time period.

85. On February 13, 2026 Carroll emailed Mayor Moran describing disputed fire compliance allegations and seeking a meeting.

86. Moran responded on February 19 that he would arrange a meeting. On March 12 Carroll again asked for review, supplied police report material, and Moran said he would contact or meet the town manager and raise the issue.

87. On March 13, 2026 Carroll in writing requested written clearance from the Manchester Fire, Building, Zoning and Code Enforcement to address the alleged continuing effect on her residences and business. No clearance has been issued to date despite the September 12, 2025 letter stated that the investigations had been closed with no outstanding compliance violations.

88. On March 25, 2026 Manchester's Building Department wrote Carroll in case 2500124 that "there are no pending violations of the building code at 101-103 Cedar Street." The same letter invited her to discuss "the prior noncompliance issues with the property and the manner in which to bring those portions of the property in compliance with the building code." Carroll alleges this language left uncertainty despite the earlier written statement that violations had been corrected and the case closed.

89. Carroll repeatedly sought a compliance letter from Manchester's town attorney and Building Department but did not receive the requested clearance. She alleges she could not provide ABH or DMHAS a document the Town would not give her and would willingly have supplied occupancy reports had officials asked.

90. By email on October 28, 2025 addressed to Thrall and copying the Manchester Fire Marshal, Plaintiff requested a letter from the town stating that her operations were compliant and that ABH/DMHAS were not accepting the September 2, 2025 letter as sufficient to show such compliance. She noted in the email that she had even dropped by the office of the building department and town attorney in pursuit of a more clarifying letter. Her email attached a copy of the September 2, 2025 letter and copied ABH CEO Paul Zakarian.

91. To date, no department of the Town of Manchester, not the Fire Department, Building Department, nor any other department has provided Plaintiff with any clarifying letter, nor has there been any letter stating that Plaintiff's operation is *not in compliance* with municipal regulation.

**Manchester's Continuing Refusal to Provide Effective Compliance Clearance Despite Notice of Resulting Financial Harm**

92. On or about September 2, 2025, Manchester's Chief Building Inspector issued a letter stating that the violations previously identified at Plaintiff's Cedar Street recovery residence had been corrected and that the enforcement case was closed.

93. Notwithstanding the issuance of that letter, Advanced Behavioral Health, Inc. ("ABH"), acting in connection with the Connecticut Department of Mental Health and Addiction Services ("DMHAS"), continued to withhold authorization for new admissions under the BHRP program, on the ground that the documentation provided did not sufficiently establish that Plaintiff's Man-

chester recovery residence had received the necessary municipal compliance clearance.

94. Plaintiff advised Manchester officials that the September 2, 2025 closure letter was not being accepted by ABH as sufficient documentation to permit the resumption of new BHRP admissions.

95. On October 28, 2025, Plaintiff sent an email to Defendant Roger Thrall and the Manchester Fire Marshal requesting a letter expressly confirming that her recovery residence was in compliance with all applicable municipal regulations and that no outstanding violations prevented its continued operation.

96. In that communication, Plaintiff explained that, notwithstanding the earlier closure letter, ABH continued to regard the municipal documentation as insufficient and that new admissions remained suspended, causing continuing interference with Plaintiff's recovery housing operations and associated financial harm.

97. Plaintiff also sought an effective compliance clearance letter directly from Manchester's Building Department and the Town Attorney's Office, explaining that the existing documentation had not satisfied ABH and DMHAS.

98. Through these communications, Manchester officials were placed on actual notice that the Town's prior enforcement proceedings and the absence of sufficiently definitive municipal clearance documentation were continuing to have adverse consequences for Plaintiff's ability to accept new BHRP referrals and obtain the corresponding program revenue.

99. Plaintiff alleges that, notwithstanding the Town's prior determination that the identified violations had been corrected and the enforcement case closed, Manchester did not provide Plaintiff with a further written clarification or compliance determination sufficient to resolve the

documentation issue identified by ABH and DMHAS.

100. Plaintiff further alleges that, as of October 15, 2026, despite her repeated requests to the Fire Marshal's Office, Building Department, and Town Attorney's Office, she had not received the definitive municipal clearance documentation requested.

101. Plaintiff alleges that Manchester officials were aware of the continuing hardship caused by the unresolved clearance issue, including the inability to resume new BHRP admissions, the loss of anticipated program revenue, and interference with the placement of individuals seeking recovery housing.

102. Plaintiff alleges that the Town's failure to clarify its own September 2, 2025 closure determination, despite notice of the continuing consequences, was not an isolated administrative oversight but formed part of the continuing course of adverse treatment that followed Plaintiff's complaints alleging discriminatory enforcement.

103. Plaintiff further alleges that the Town's prolonged failure to provide a definitive response, considered together with the earlier expressions of hostility toward recovery residences, the subsequent inspections of her other properties, and the Town's knowledge of her protected complaints, supports an inference that the continued withholding of clarification was motivated, at least in part, by discriminatory or retaliatory considerations.

104. Plaintiff alleges that the foregoing conduct contributed to the continuation of the restrictions on new BHRP admissions and the resulting interference with Plaintiff's recovery housing operations and financial interests.

105. Carroll alleges that the repeated inspections, reduced usable bedrooms, threatened changes in inspection frequency, and response to her complaints interfered with recovery hous-

ing. Her claim of selective enforcement is based on the factual chronology and direct statements of intent/motive identified above.

## V. FACTUAL ALLEGATIONS (CITY OF HARTFORD)

### A. Hartford's Prior Knowledge, Inspections, and Approval of Recovery Housing Operations

106. On or about September 2022, Plaintiff began operating the premises at 510 New Britain Avenue, Hartford, Connecticut, as a structured recovery residence for individuals recovering from substance-use disorders. The premises were operated in connection with a housing arrangement involving Community Partners in Action ("CPA"). A March 26, 2023 certificate identifies A Fortress at 510 New Britain Avenue as a Level II recovery residence.

107. Before the residence opened, representatives of Hartford's Fire Department and Building Department inspected the premises and, according to Plaintiff, approved their occupancy for the intended recovery-housing operation.

108. At the opening of the residence, multiple Hartford municipal officials, including representatives of the Fire Department and Building Department, were present and aware that the premises would house unrelated individuals participating in a recovery-housing program. In fact Mayor Luke Bronin had been present on or about September 8, 2023 for the grand opening of the facility.

109. Deborah Regala, a representative of CPA, assured Plaintiff that the inspections and approvals required for the recovery-housing operation had been completed.

110. The contractual arrangements involving CPA expressly contemplated the operation of

recovery housing at the premises and included a requirement concerning the installation or availability of a central air-conditioning system.

111. At all times 510 New Britain Avenue was operated as a recovery residence when it was in the name of her former husband Andrew Spurgeon and once she obtained sole title to the property.

112. Carroll states that she acquired title from Andrew Spurgeon on May 16, 2025 and previously received rent associated with recovery residence use.

113. She reports that the recovery residence program was supported through a funding arrangement involving City of Hartford and DMHAS (Opiod Settlement Funds grant) and resulted in approximately $24,000 monthly payments to A Fortress until she was required to end operations around September 2025

114. Plaintiff alleges that Hartford officials knew, before the commencement of occupancy, both the intended residential use and the physical configuration of the property, including the heating, ventilation, and air-conditioning arrangements then in place.

115. Between the opening of the recovery residence and the August 2025 investigation, Hartford did not conduct further inspections of the premises by its Fire, Building, or Zoning Departments, did not advise Plaintiff that the recovery-housing use was prohibited, and did not require Plaintiff to obtain the particular Department of Public Health license subsequently asserted in September 2025.

116 Plaintiff alleges that the residence operated openly for approximately two to three years with Hartford's knowledge and without municipal demands that its recovery-housing operations

cease.

### B. Unsubstantiated Overcrowding Allegation and Subsequent Zoning Restrictions

117. On or about August 26, 2025, Hartford contacted Plaintiff concerning a complaint alleging that sixteen persons were residing at 510 New Britain Avenue.

118. At the time of Hartford's investigation, the residence housed approximately eight persons, not sixteen.

119. Hartford did not issue any finding that sixteen persons occupied the premises or otherwise establish that the alleged overcrowding had occurred.

120. After the overcrowding allegation was not substantiated, Hartford officials asserted that the property was improperly zoned for its existing recovery-housing use.

121. Hartford officials informed Plaintiff that the premises had previously been classified or authorized for use as a convent rather than as a group home or recovery residence.

122. Sharon Cheeks of Hartford's Zoning Department informed Plaintiff that no more than three unrelated persons could reside at the property under the City's interpretation of the applicable zoning requirements.

123. Plaintiff alleges that Hartford's application of this unrelated-person occupancy restriction directly affected the recovery residence because its residents were individuals recovering from substance-use disorders who lived together in a structured, supportive residential environment without being related by blood or marriage.

124. Hartford directed Plaintiff to reduce the occupancy of the residence to three persons and to provide daily emails to Cheeks's department reporting the progress of that reduction.

125. Plaintiff complied with the reporting requirement and possesses contemporaneous emails documenting her communications with Hartford concerning the reduction in occupancy.

126. Plaintiff alleges that the required reduction from approximately eight residents to three displaced individuals from recovery housing, substantially impaired the continued operation of the residence, and deprived remaining and prospective residents of the benefits of their established group-living arrangement.

127. Plaintiff alleges that the City's treatment of unrelated individuals living together in a disability-related recovery residence, considered together with its prior knowledge of the property's use, supports an inference of discriminatory application of its occupancy and zoning requirements.

### C. Department of Public Health Licensing Requirement Later Acknowledged to Be Mistaken

128. During the September 2025 enforcement proceedings, Hartford officials informed Plaintiff that the operation of the recovery residence required a license from the Connecticut Department of Public Health.

129. Plaintiff was directed to cease or substantially curtail the recovery-housing operation while the City maintained that the asserted licensing and zoning requirements had not been satisfied.

130. Plaintiff alleges that the asserted Department of Public Health licensing requirement was one of the reasons communicated to her for requiring the removal of residents.

131. At the January 2026 hearing on Plaintiff's application for temporary injunctive relief, counsel for Hartford acknowledged to the Court, in substance, that the City had initially believed

that a Department of Public Health license was required but subsequently learned that such a license was not required for Plaintiff's recovery-housing operation.

132. By the time Hartford made that acknowledgment, Plaintiff had already complied with the City's direction to reduce occupancy and had sustained the resulting disruption of the recovery residence.

133. Plaintiff alleges that Hartford's subsequent acknowledgment that its asserted licensing requirement was mistaken is evidence relevant to whether the City's September 2025 displacement demands rested upon an adequate and consistently applied regulatory basis.

134. Plaintiff further alleges that Hartford did not restore the displaced residents to their prior housing arrangements or otherwise reverse the consequences of its earlier reliance upon the mistaken licensing requirement.

**D. Hartford's Communications with ABH Concerning Displacement**

135. On or about September 12, 2025, Judith Rothschild of Hartford's Zoning Department informed Plaintiff that Hartford had contacted Michelle Masi of Advanced Behavioral Health, Inc. ("ABH") concerning the displacement of residents from 510 New Britain Avenue.

136. Rothschild informed Plaintiff that Masi had indicated that ABH would assist Hartford in identifying alternative housing for residents if the City required their removal.

137. Plaintiff alleges that ABH did not separately offer Plaintiff comparable assistance in maintaining the residents' existing housing arrangements or relocating them within Plaintiff's available recovery-housing network.

138. Plaintiff had previously assisted ABH when residents of another recovery residence re-

quired emergency relocation, including accepting displaced residents into her own housing program.

139. Plaintiff alleges that Hartford's communication with ABH concerning the removal and relocation of residents occurred against the background of Manchester's earlier communications concerning Plaintiff's recovery residences and the ongoing ABH/DMHAS investigation of her Manchester operations.

140. Plaintiff alleges that these communications establish actual interagency contact concerning the consequences of municipal enforcement actions affecting her recovery-housing operations.

**E. Subsequent HVAC, Sprinkler, and Permitting Issues**

141. After Hartford's initial overcrowding investigation and subsequent zoning enforcement, City officials raised additional issues concerning the premises, including the central air-conditioning and HVAC system, related electrical and mechanical permits, and the absence of a fire-sprinkler system.

142. Plaintiff alleges that, before the 2025 enforcement proceedings, Hartford had not advised her that these matters prevented occupancy of the premises as a recovery residence, notwithstanding the earlier municipal inspections and officials' knowledge of the property's intended use.

143. Plaintiff further alleges that the central air-conditioning system was contemplated by the CPA housing arrangements and was present or installed in connection with the operation of the recovery residence.

144. During the subsequent permitting process, Hartford officials informed Plaintiff or her contractors that approval of the mechanical permit depended upon the status or sequencing of electrical and other required approvals.

145. Plaintiff and her contractors attempted to obtain the necessary administrative approvals, but the process continued for several months after the September 2025 enforcement actions.

146. Plaintiff alleges that Hartford's handling of the permit applications delayed resolution of the outstanding municipal requirements and interfered with her efforts to maintain, restore, or dispose of the property.

147. Plaintiff further alleges that her electrician and HVAC contractor ultimately were not required to undertake additional physical reconstruction or corrective installation work as a condition of the eventual resolution of the identified permit issues.

148. Plaintiff alleges that the absence of required physical rework, considered together with Hartford's prior knowledge of the property and its earlier inspections, supports an inference that at least some of the subsequent permitting obstacles were administrative rather than the result of newly discovered physical hazards.

149. Plaintiff does not contend that prior municipal knowledge eliminated the City's authority to enforce genuinely applicable safety requirements. Rather, Plaintiff alleges that the timing, sequence, inconsistent explanations, and manner of enforcement are relevant to whether those requirements were applied selectively to her disability-related housing operation.

**F. Subsequent Sale and Treatment of the Property**

150. As a result of the restrictions imposed upon the recovery-housing operation and the resulting financial and operational consequences, Plaintiff ultimately discontinued the recovery-housing use and sought to sell the property.

151. Plaintiff subsequently sold 510 New Britain Avenue to Vinfen.

152. Upon information and belief, after acquiring the property, Vinfen obtained a special permit or other municipal authorization to operate a recovery residence or comparable disability-related residential program at the premises.

153. Plaintiff alleges that the nature and conditions of any authorization granted to Vinfen are relevant to determining whether Hartford afforded Plaintiff an equal opportunity to obtain approval for the same or a materially comparable use.

154. Plaintiff further alleges that Hartford's enforcement actions caused displacement of residents, loss of the ability to operate the premises as an established recovery residence, additional carrying and administrative expenses, and impairment of the property's value as an operating recovery-housing business.

155. Carroll alleges that before the title transfer from her former husband there had been municipal awareness of the recovery residence operation without any closure demands.

156. For approximately two years before the challenged enforcement, Hartford knew the house was operating as recovery housing. Carroll alleges that, while Andrew Spurgeon owned it, there were no surprise or unannounced enforcement visits, no closure demands, and no demands for the particular license later asserted. She alleges prior operation complied with applicable building and safety requirements and that no neighbor had filed a complaint.

157. On August 26, 2025 a Hartford Fire Marshal representative called Carroll about an emailed complaint alleging that there were sixteen occupants of the New Britain Avenue residence.

158. On August 29 fire personnel inspected and directed the removal of beds and installation of a lock within approximately two hours, threatening immediate shutdown if the instructions were not followed. Residents removed the beds.

159. First, on August 29, 2025 the Hartford Fire Marshal notified Plaintiff by letter that it had conducted an inspection of the premises for the purpose of determine compliance with the state fire safety code. She was given thirty (30) days to correct claimed specified violations: all related to matters such as smoke detectors, fire alarms, fire doors, front door locks, manual pull stations.

160. Plaintiff was informed that the inspection was prompted by an anonymous complaint (upon information and belief to have been from the Manchester Fire Department Marshal, Roger Thrall), after which the City of Hartford put forward varying reasons for its inspection and monitoring of Plaintiff's 510 New Britain Avenue recovery residence.

161. When the City of Hartford first visited the New Britain Avenue property, Plaintiff was informed that the visit was for the purpose of determining if there was overcrowding at the recovery residence. Plaintiff has never been informed by the City of Hartford of any finding of overcrowding at the New Britain Avenue recovery residence.

162. Carroll describes Hartford fire officials' manner during the August 29 visit as rude and hostile. One said, "we told you to remove the bed," and threatened immediate closure unless the men removed the beds within two hours; the men promptly did so.

163. On September 3 City of Hartford fire, zoning and building personnel revisited the property. Carroll identifies Fire Marshal Lieutenant Lambert among the participants. On September 5 zoning personnel requested a further meeting.

164. On September 4 at 7:42 a.m. Carroll emailed Chief Zoning Administrator Sharon Cheeks an initial recovery residence certificate, a program audit and a sober house law enforcement memorandum, and offered CPA contact Beth Hines to identify the Hartford funding department. She asked what further information the City required.

165. On September 4 at 7:56 a.m. Carroll emailed Cheeks that she had acquired the property in her sole name on May 16, had previously paid rent to Andrew Spurgeon, and had incurred more than $18,000 in taxes and $11,000 in insurance. She warned that residents faced homelessness. The transmitted information placed Cheeks on notice of the recovery housing use and asserted displacement consequences.

166. On September 4 at 8:08 a.m. Carroll sent an email including Hartford governmental recipients Marilyn Rossetti and Shirley Surgeon, expressly characterizing the City's conduct as retaliation and referring to an active complaint concerning the Town of Manchester.

167. Second, in a September 11, 2025 Notice of Violation, the City of Hartford relied upon a claim that a special permit and state license were required to operate a sober living house in this property, and that all operation of a sober house must cease immediately.

168. On or about September 12, 2025 Carroll met with Hartford planning/zoning, fire and building personnel. She was told that a Department of Public Health license was required and that residents must be removed; Michelle Masi was identified as a state contact for possible relocation.

169. The September 12 meeting was at approximately 1:30 p.m. Participants included planning and zoning personnel, the Fire Marshal, Fire Chief, Building Department personnel, and another person. Officials contacted Michelle Masi, identified in Carroll's earlier account as a state contact, who offered to find residents other housing.

170. Carroll alleges that residents requested permission to remain in the dwelling as a recovery living group arrangement and that officials refused.

171. The request sought continuity of housing while the parties clarified the precise land use category and licensing requirements. Carroll does not allege a right to disregard genuinely applicable fire or life-safety requirements.

172. At the September 12 meeting, Carroll requested on behalf of the affected residents permission to remain temporarily while applicable licensing issues were addressed and alternative housing was identified; the request was directed to the Fire Marshal, Fire Chief, and planning and zoning representatives. Hartford demanded immediate removal without considering the residents' disabilities or alternative accommodations.

173. Carroll alleges that officials also required the recovery house to reduce occupancy to three persons and directed daily occupant count emails to Cheeks.

174. Hartford asserted that the operation was a "Group Living for Health Reasons" use requiring a special permit under zoning provisions including § 3.3.1(D).

175. The parties dispute the correct classification and whether the recovery residence required the particular Department of Public Health license described at the September meeting.

176. Carroll alleges that the City's directions prevented continued operation as a recovery residence, displaced residents, and reduced her ability to maintain the property as an operating housing business. She disputes that the record identifies an imminent life safety hazard requiring permanent termination of the use.

177. Carroll alleges Hartford offered shifting reasons: initially overcrowding, then fire-code matters, then a special permit and state license. She alleges Hartford never informed her of an actual overcrowding finding. The August 29 notice nonetheless listed specific fire-code items with a thirty-day correction period. Carroll disputes an imminent risk justifying immediate displacement or permanent closure.

178. Carroll alleges the asserted reasons were pretextual and were not applied consistently to comparable housing of non-disabled persons, including unrelated roommates, fraternities, and group rentals.

179. Carroll did not pursue administrative appeals of Hartford's code notices. She alleges that a coordinated directive by the City's fire, building, and planning and zoning personnel at the September 12 meeting reflected a definitive municipal position, made an appeal futile in her view, and immediately injured the residents by ordering their displacement. She alleges the combined

action was authorized by senior municipal officials and represented Hartford's municipal decision rather than an isolated inspector's action.

180. In January and February 2026 Carroll's HVAC contractor Mark Sadoski attempted to obtain permits for work at the property. A January 6 estimate totaled $972.60.

181. A February 5 pre-application was closed as "Entered in Error," with instructions to use an accessory structure application and supply site information.

182. On February 6, 2026 Hartford Building Plans Examiner Raymond Marcotte reported that Planning and Zoning had denied mechanical application MISC-MEC-26-000007 and that he could not issue the permit without zoning approval.

183. The contractor continued seeking clarification, and on April 2 reported the mechanical permit had been issued.

184. On May 7, 2026 Carroll told Hartford Planning that she no longer operated a sober house and intended to sell the property. She requested resolution of open zoning and permit records affecting the sale.

185. On May 7, 2026 Cheeks closed enforcement case PLNG-CASE-25-000251 because Carroll had discontinued the recovery use and was selling the property. The closure letter warned that renewed "Group Living for Health Reasons" use without the required special permit could generate a new case and order. Carroll alleges this warning continued to restrict her ability to market the property for recovery housing.

186. Carroll reports a sale price of approximately $420,000 and asserts that a sale of the property together with an operating recovery business had been estimated as could have been worth approximately $875,000.

187. Carroll alleges a loss of those receipts begin on or about September 2025.

188. Carroll further alleges carrying costs, vacancy, interruption of recovery services, resident relocation, and impairment of her ability to use Manchester as overflow housing. Any claimed post-September loss of Hartford payments must account for the conflicting payment endpoint descriptions.

189. Carroll alleges that the City of Hartford knew the premises housed persons recovering from substance use disorders and that the demands were imposed only after she complained about disability discrimination and after Thrall contacted the City of Hartford Fire Marshall..

190. Carroll alleges, upon information and belief, that Hartford acted on Manchester's cross-jurisdictional referral in coordination with the other defendants and that the referral carried forward Thrall's discriminatory and retaliatory purpose. She relies on the referral, Thrall's Hartford inquiry, the prior period of operation with municipal knowledge, and the ensuing multi-department restrictions. The disclosed report of a referral is not treated as an admission by Zambetti of discriminatory motive.

## VI. FACTUAL ALLEGATIONS (ABH)

191. ABH administered recovery housing program functions for DMHAS.

192. An October 10, 2023 program audit identifies 101–103 Cedar Street and a Birch Street location in Manchester and names Marisol Cortes and Carleen Zambetti as reviewers.

193. The audit recorded favorable compliance ratings for Plaintiffs' recovery residences in several chart review categories while also raising matters requiring attention; the document does not constitute a zoning permit.

194. Carroll states that a 2023 corrective action plan concerned administrative case-management documentation rather than building or occupancy violations, and that she adjusted staffing and procedures to meet ABH requirements.

195. Carroll's 2023 corrective action plan concerned administrative case-management notes, not occupancy, zoning, operational safety, or building violations. Other providers received similar plans. She hired replacement staff, including case-management and inspection personnel. Rather than dismiss the program manager who had been with her since opening and was authorized to represent her in her absence, she followed Michelle Masi's suggestion to divide billing from resident meetings and case notes.

196. ABH and DMHAS had prior knowledge of A Fortress as a recovery housing provider and indeed had provided financial services to Plaintiff's Manchester recovery residences for a period of approximately three years prior to any complaint or notice of violation from the Town of Manchester.

197. The July 21, 2025 email described above circulated within ABH and DMHAS and reported Thrall's overcrowding claims, Manchester's assertion it had addressed immediate risks, and its referral to Hartford. Carroll alleges ABH knew Hartford was outside its coverage.

198. On July 24, 2025 ABH representative Marisol contacted Carroll's program manager April Hill and conducted a visit to investigate a Manchester Fire Department complaint.

199. On July 24, 2025, Plaintiff's program manager "received a call from Marisol of ABH who stated that she was coming out to the property … to investigate a complaint that had come in from the Manchester Fire Department.

200. Upon information and belief there was no reason for Manchester to contact ABH for purposes of its fire, zoning, or building code enforcement.

201. Plaintiff alleges that ABH, as did Defendant Thrall, questioned conserved individuals "without a release of information from their conservator."

202. Carroll alleges that Marisol questioned residents, including conserved persons, in violation their HIPAA rights, without securing the consent or participation Carroll believed necessary.

203. Marisol Cortes told program manager April that she would arrive at approximately 1:30 p.m. July 24 to investigate the Manchester Fire Department complaint. She questioned the same conserved persons Manchester had questioned, without a release from their conservators. One reported living there two months and that his roommate had been there since November 2024; Carroll disputes those accounts based on her records and the resident's recent transfer from Hartford.

204. Carroll complained that resident accounts were inconsistent with actual housing records and that ABH did not request access to the Oath Track utilization reports, conservator statements, or nursing records before relying on occupancy accusations. ABH was aware of Plaintiff's use of the Oath Track software because of regular sharing of data from that software with ABH by Plaintiff.

205. Carroll alleges conservators' statements and a medication nurse's knowledge contradicted the occupancy accounts. A nurse dispensed medication twice a day, five days a week. Carroll reports having statements that one person never lived in Manchester at all. Marisol told her "Keep it real," which Carroll understood as an accusation that she was lying.

206. On September 12, 2025 Carroll emailed Michelle Masi, Carleen Zambetti and other agency personnel contesting the manner of the investigation and describing her complaints to civil rights agencies.

207. In the September 12 email to Michelle Masi and Carleen Zambetti, Carroll stated that she had warned ABH a week before its visit that Manchester was targeting her with false complaints; she objected to questioning conserved people without releases, rather than simply to an unannounced visit. She described her occupancy records, conservator and nurse evidence, disputed the alleged August 12 re-inspection, noted that she regained use without repairs, and stated that state and federal discrimination complaints remained pending. She copied counsel and emphasized that she would never jeopardize residents' lives or defy authority.

208. At approximately 10:56 a.m. an ABH communication from Zakarian, ABH's CEO stated that ABH had consulted with DMHAS and would halt any new BHRP-B admissions into "A Fortress" while they investigated "these issues". to Plaintiffs pending investigation, while maintaining services for existing participants and certain prior requests. While ABH had a contract with "A Fortress" with regard to its Manchester recovery residences, it has never had any such contractual relationship with "A Fortress" with regard to the Hartford residence.

209. At the same time ABH halted new admissions to Plaintiff, it also requested in writing to obtain a copy of the contract that Plaintiff had for the Hartford recovery residence, despite the fact that Plaintiff has never had any ABH/DMHAS contract or funding for that location.

210. Upon receipt and review of the Hartford recovery house contract from Plaintiff, ABH through its employee Masi, acknowledged that the property was sublet to Plaintiff to operate the "Recovery housing program for CPA housing participants", but not directly with the City of Hartford. Neither ABH/DMHAS has ever provided any reason to Plaintiff why it was seeking any information at all on the operation of Plaintiff's Hartford recovery residence, a residence for which ABH/DMHAS had no contractual or oversight responsibilities, and no financial ties.

211. ABH, on or about September 25, 2025 and continuing thereafter, for the first time ever demanded access to the contract between Plaintiff involving the operation of the 510 New Britain Avenue recovery residence.

212. The Hartford residence was not subject in any way to BHRP-B financial support, nor monitoring by ABH or DMHAS. At all times prior to September 2025 Plaintiff's Hartford recovery residence had operated without any oversight, monitoring or financial support from ABH.

213. ABH insistence upon contract review and oversight by ABH came only after receipt of a complaint by the Manchester town officials and Thrall.

214. On September 25, 2025 ABH coordinator Michelle Masi informed Plaintiff in an email that the hold on new admissions "was at DMHAS's direction" and that Zambetti would need to approve the halt removal as had been requested by Plaintiff.

215. As of October 2, ABH, through Masi, advised Plaintiff that the halt "remains under DMHAS review" and that they would let her know as soon as there was an update. As of the date of this amended complaint, October 16, 2026 Plaintiff has never been advised by ABH/ DMHAS that the halt has been lifted.

216. Carroll alleges that the BHRP-B admissions halt deprived her of new program placements at Manchester residences, jeopardized staffing and financial viability, and prevented her from accommodating displaced Hartford residents in available Manchester beds.

217. On or about September 2025 and continuing to date, Carroll requested that ABH reconsider her occupancy records and explanations and restore admissions. She alleges that the restrictions persisted without a meaningful opportunity to rebut the asserted occupancy basis.

1218 The September 12 communication identifies a concrete ABH–DMHAS consultation.

219. To date, ABH has failed and refused to explain its interest in the Hartford recovery house contract, or operation of that residence by Plaintiff.

220. Although DMHAS did not directly contract with Hartford or directly pause that location; its Manchester admissions pause on Plaintiff's operations nevertheless prevented transfer of displaced Hartford residents to Manchester, which Carroll had previously used for overflow purposes.

221. Plaintiff received three Notice letters from the Town of Manchester dated July 17, 2025 with regard to the 101 Cedar Street Manchester recovery residence. The three letters were all under **Case Number 2500124** and were pursuant to State Building Code Sections 114, 115 and 222. The notices of violations were all under the signature of the Manchester Building Department official.

223. Plaintiff has never received or been informed by the Town of Manchester or Thrall of any violations other than those contained in the notices for **Case Number 2500124**. Nor has Plaintiff received any notices of violations with regard to the Birch Street or Walnut Street locations.

224. The Town of Manchester supplied a letter dated September 2, 2025 to Plaintiff informing her that, with respect to **Case Number 2500124**, the only violations ever given regarding Plaintiff's operations in Manchester, "the violations had been corrected and the case has been closed."

225. This letter regarding **Case Number 2500124** stating that the case was closed and all violations had been corrected, was supplied by Plaintiff to ABH/DMHAS on or about September 2, 2025.

226. Yet ABH/DMHAS has refused to accept the Manchester letter when it placed a halt on new admissions to Plaintiff's Manchester operations and continues to do so to date.

227. The Town of Manchester has never found, nor notified Plaintiff, of any violation of overcrowding at any of her recovery residences in that town.

228. Even as of November 10, 2025 Plaintiff emailed Zambetti, Zakarian, Maasi, and Thrall providing extracts from the OathTrack software used by her in managing bed occupancy rates at the Manchester operations. Plaintiff notes in the email on November 24, 2025 that she had received 20 points by ABH for utilizing this technology and stating that no one would allow her to present any information from OathTrack or other information that she had with regard to bed occupancy in Manchester.

229. Upon information and belief, ABH/DMHAS did not and does not have a concern about overcrowding at any of the Manchester operations because (a) it has no finding of a violation based upon overcrowding; and (b) it has never sought to examine her records regarding occupancy.

230. Plaintiff had never had any complaints regarding overcrowding through ABH/DMHAS until Thrall and Manchester raised these claims in 2025. The only complaint that Plaintiff had from ABH prior to the Manchester complaints was on one occasion sometime in 2023 when a client at Cedar Street was sleeping on a couch rather than in his own bed because he did not want to sleep in his own room. ABH investigated and determined at that time that there was no violation related to overcrowding.

231. In fact, in or about May 2023 Masi of ABH had asked Plaintiff to house some individuals who had been displaced when a fire occurred at another Manchester recovery residence called Sober Solutions? Plaintiff was able to take in two of the fourteen displaced clients.

232. Carroll repeatedly called and sought reconsideration by ABH and DMHAS, requested an opportunity to present her version and proof, and received no effective response. She alleges she had exhausted the practical options available to show she did not violate zoning or her contract by housing persons in an attic.

## VII. FACTUAL ALLEGATIONS (DMHAS AND COMMISSIONER NAVARRETTA)

233. DMHAS oversaw Plaintiff's recovery housing funding and administrative functions carried out in part through ABH. DMHAS has admitted that it contracts with ABH to administrate DMHAS's BHRP program including funding of SHRS beds

234. Carroll alleges that DMHAS's requirements for staffing and case management affected the economics of her Manchester recovery houses.

235. Carroll alleges that, while DMHAS did not directly fund Hartford SHRS beds or fund Walnut Street, state opioid funds controlled by DMHAS supported the Hartford reentry program through a grant to Hartford of approximately $24,000 monthly over roughly two years. She used revenue from that program to establish scholarships providing sixty days of free Manchester housing for residents not covered by DMHAS funding. These indirect funding allegations are distinct from direct BHRP-B/SHRS contracts.

236. Through ABH, DMHAS learned of Thrall's July overcrowding and attic allegations and of Manchester's call to Hartford. Zambetti acknowledged in her affidavit that, after the report and an unannounced Cedar Street visit, DMHAS found no imminent client risk if the attic was not used and allowed continued operation and BHRP admissions.

237. Zambetti acknowledged in her affidavit in support of the Motion to Dismiss filed by Navarretta that she became aware through their agent, ABH, that ABH had received a telephone call

from Thrall, Manchester Fire Marshal, on July 21, 2025, alleging false claims of often receiving calls about overcrowding at Plaintiff's sober living homes, especially at the Cedar Street location and alleged fire code violation related to the attic space. Zambetti also acknowledged that Thrall informed ABH/DMHAS that he/Manchester Fire Department had placed a call to the "Hartford Office" to advise of concerns about overcrowding. Further, Thrall advised that Plaintiff may have moved some Cedar Street residents to another home operated by her in Hartford. This was false.

238. Zambetti acknowledged in her affidavit that DMHAS decided, after hearing the report from Thrall and conducting its own unannounced visit to Cedar Street, that was no imminent risk to clients as long as the attic space was not utilized and that Plaintiff could continue to operate and accept BHRP clients for admission.

239. On August 20, 2025 HUD official Lucy Allen corresponded with Carroll concerning housing discrimination inquiry 846425 and sought further information.

240. On September 3, 2025 Carroll forwarded that HUD correspondence to state agency participant Carleen Zambetti, a Behavioral Health Clinical Supervisor for DMHAS, and identified it as one of her complaints along with a DOJ complaint.

241. The September 3 transmission predates the September 12 BHRP-B admissions halt and supports agency level notice to Zambetti. It does not show that Commissioner Navarretta personally received the email or directed the decision.

242. Zambetti acknowledged in affidavit that she had become aware of Plaintiff's protected opposition activity when she received on September 2 and 3, 2025 from Plaintiff forwarding an email to the U. S. Department of HUD regarding her "discrimination claims." On September 12

Carroll emailed Zambetti and Michelle Masi at ABH complaining of the ABH unannounced site inspection after having advised that the Manchester Fire Department was "targeting" her with false complaints.

243. Zambetti acknowledged receiving Carroll's September 2 and 3 communications forwarding HUD correspondence about her discrimination claims. These communications preceded the admissions halt.

244. On September 12 ABH represented that it consulted DMHAS before halting new BHRP-B admissions to Plaintiff.

245. In an affidavit submitted to the court in support of its motion to dismiss, Zambetti admits that DMHAS did not fund any SRSH beds at the 510 New Britain Avenue location. Thus, there was no reason for DMHAS, in consultation with ABH, to halt new BHRP-B admissions to Plaintiff's other recovery houses

246. Carroll alleges that the halt has, and continues to, interfere with operation of her recovery residences and seeks prospective relief against the Commissioner to the extent she has legal authority to discontinue an ongoing unlawful restriction.

247. Despite Zambezi acknowledging that DMHAS /ABH having found no imminent risk to clients, "upon receipt of Carroll's September 12 email, DMHAS made the determination, based on concerns about fire safety and zoning violations, to halt new admissions into SHRS beds at 101-103 Cedar Street and 47 Birch Street until documentation from the Town of Manchester as to fire code and other violations on Plaintiff's sober living properties."

248. Carroll alleges that from on or about September 15 ABH/DMHAS agency representatives requested documents concerning 510 New Britain Avenue, including a lease, although she did not directly contract with DMHAS for that location. She denies that DMHAS has any agency authority over the Hartford property.

249 Carroll alleges that she sought reconsideration of the admissions halt and provided or offered evidence of actual occupancy and safe housing. She maintains that DMHAS/ABH did not identify any imminent safety risk at the time of the July investigation and did not impose the admissions pause until September. The admissions pause affected all recovery residences operated by Plaintiff.

250. On September 25, 2025 ABH's Michelle Masi stated the hold was "at DMHAS's direction" and required Zambetti's approval to remove it. On October 2 ABH said the halt remained under DMHAS review. Carroll alleges no subsequent notice lifting it as of October 16, 2026.

251. In her affidavit, Zambetti acknowledged that on September 25, 2025 Carroll emailed her and ABH CEO and staff inquiring about the halt on admission and when it would be lifted, stating her belief that the halt was retaliatory for her having complained about the Thrall and ABH interviews of residents without releases of information was improper and that Carroll was then informed that at the time (i.e. September 25, 2025) DMHAS and ABH were still awaiting information rom the Town of Manchester.

252. ABH/DMHAS have never accepted the September 2, 2025 letter from Manchester which stated that “the violations have been corrected and the case has been closed”. Despite multiple attempts to obtain clarification from ABH/DMHAS and Manchester regarding the sufficiency of the case closure letter, none has ever been provided and Plaintiff’s operations remains on “halt”.

253. As of October 5, 2025 DMHAS’s website continued to list A Fortress’s two Manchester locations as sober houses, including available beds. In or about 2026, after this lawsuit was filed, DMHAS removed the listing from the website through which potential residents find sober housing.

254. Every Monday (i.e. before and after the filing of this lawsuit and to date) Carroll updated available bed counts through DMHAS’s iCAL portal and had done so throughout the years she operated. She continued submitting weekly availability updates after DMHAS removed the public listing.

255. The claims against Navarretta are limited to prospective official capacity relief for any continuing violation of federal law. damages and retrospective relief are not requested against her in that capacity.

## VIII. PROTECTED ACTIVITY INJURY AND CAUSATION

256. Carroll opposed conduct she reasonably believed to be discriminatory in communications to DMHAS, ABH and Thrall, complained to the Attorney General, filed a DOJ civil rights complaint in July 2025, notified Manchester of a CHRO filing on July, 31, 2025, and pursued a HUD inquiry by August 2025. The content and receipt of each complaint will be proved through the original correspondence.

257. The sequence of Manchester inspections after July complaints, ABH/DMHAS notice before the September admissions halt, and Hartford municipal recipients' September 4 notice before subsequent zoning restrictions supports Carroll's retaliation theory as to those actors who actually received notice. She does not rely solely on the existence of complaints to infer knowledge by every defendant.

258. Carroll alleges loss of rental and program income, reduced capacity, increased operating expenses, impaired property sale opportunities, relocation expenses and disruption of supportive recovery housing. The amount, duration and causal attribution of each item will be established by property specific accounting and transaction records.

259. Carroll alleges that repeated Manchester inspections began in April 2025 and occurred approximately every other month, becoming more frequent after her July 4 disability concerns and July federal and CHRO complaints. She alleges the combined inspections, reduced usable rooms, displaced paying residents, lost admissions and staffing obligations disrupted recovery services, frightened residents, threatened housing stability, and undermined the financial viability of each house.

260. Carroll alleges, upon information and belief, that the defendants acted individually and in concert with discriminatory intent or effect and in retaliation for her reports to HUD, the Attorney General and CHRO. She bases the coordination allegation on the particular Manchester–Hartford and Manchester–ABH–DMHAS communications described above, together with the chronology, rather than treating every recipient as having necessarily received every complaint.

**Municipal Policy, Custom, Supervisory Approval, and Deliberate Indifference (Town of Manchester)**

261. Plaintiff incorporates the preceding allegations concerning the April 2025 inspection of 73 Walnut Street and the subsequent inspections and enforcement actions involving her Cedar Street and Birch Street recovery residences.

262. The discriminatory treatment alleged herein was not confined to the isolated conduct of Defendant Roger Thrall but involved officials occupying supervisory positions within the Town of Manchester's Building Department, together with personnel of its Fire Marshal's Office.

263. During the April 2025 inspection of 73 Walnut Street, Defendant Thrall expressly stated that he did not want a facility “like this” in Manchester, while an accompanying Building Department official stated that a bedroom configuration requiring passage through one bedroom to reach another would be acceptable for members of a family but unacceptable for Plaintiff's residents because they were unrelated.

264. These statements were made during the same municipal inspection and reflected the officials' express consideration of the residents' household composition in evaluating the permissible use of the dwelling.

265. Thereafter, Defendant Thrall participated in the subsequent municipal inspections of Plaintiff's recovery residences, including the inspections at Cedar Street and Birch Street.

266. The enforcement actions at Cedar Street were not undertaken solely by Thrall. Formal notices of violations arising from the Cedar Street inspections were signed and issued by the Assistant Chief Building Inspector of the Town of Manchester.

267. The participation of the Assistant Chief Building Inspector demonstrates that the restrictions imposed upon Plaintiff's recovery residence were implemented through the Town's formal building enforcement process and were not merely informal statements or unauthorized actions by Thrall.

268. On September 2, 2025, the Chief Building Inspector signed a letter advising Plaintiff that the Cedar Street enforcement case had been closed because all required corrections had been made.

269. Plaintiff alleges that the Chief Building Inspector's issuance of the closure letter demonstrates supervisory review and official departmental disposition of the enforcement proceedings that had resulted in restrictions upon Plaintiff's recovery residence.

270. Plaintiff further alleges that the Town's enforcement actions must be evaluated in light of the earlier statements of Thrall and the Building Department official concerning the undesirability of recovery residences and the asserted distinction between occupancy by traditional families and unrelated recovery-house residents.

271. On July 31, 2025, Plaintiff's counsel transmitted Plaintiff's initial complaint to the Connecticut Commission on Human Rights and Opportunities concerning the allegedly discriminatory treatment of her recovery residences, with Manchester Mayor J. Moran copied on that communication.

272. The July 31, 2025 communication placed the Mayor on notice that Plaintiff was alleging

discriminatory treatment by municipal enforcement officials in connection with the operation of housing for persons recovering from substance use disorders.

273. Notwithstanding this notice, municipal enforcement activity involving Plaintiff's recovery residences continued, including the August 6, 2025 inspection of the Birch Street property.

274. Mayor Moran subsequently advised Plaintiff that she could contact him concerning a meeting to discuss her complaints. Plaintiff alleges that, despite these communications, the Mayor did not undertake any corrective action known to Plaintiff that reversed the challenged restrictions or addressed the allegedly discriminatory conduct of Thrall and the Building Department officials.

275. Plaintiff alleges that the involvement of multiple municipal officials, the issuance of formal enforcement notices by the Assistant Chief Building Inspector, the Chief Building Inspector's official disposition of the enforcement proceedings, and the Mayor's receipt of notice of the discrimination allegations demonstrate that the challenged actions were undertaken through established municipal enforcement channels.

276. Plaintiff further alleges that the sequence of enforcement actions involving Walnut Street, Cedar Street, and Birch Street, considered together with the officials' statements and the Town's continued enforcement following notice of alleged discrimination, supports an inference that the challenged treatment reflected a municipal practice or custom rather than an isolated, unauthorized act of a single employee.

277. Plaintiff alleges that, to the extent the challenged restrictions were imposed or maintained pursuant to an official municipal policy, an established municipal practice, or decisions of officials possessing final policymaking authority over the particular enforcement matters, those mu-

nicipal actions were a moving force behind the deprivation of Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment.

278. Plaintiff alleges that the Town's conduct caused restrictions upon available bedrooms, interference with recovery-housing operations, loss of housing opportunities for persons with disabilities, and financial injury to Plaintiff.

## IX CLAIMS FOR RELIEF

### COUNT ONE — FAIR HOUSING ACT DISABILITY DISCRIMINATION (42 U.S.C. § 3604(f)) (TOWN OF MANCHESTER, CITY OF HARTFORD AND ABH)

279. Plaintiff incorporates paragraphs 1–278 as if fully set forth herein.

280. Plaintiff alleges that defendants interfered with making recovery housing available because of disability.

281. As to each defendant, liability is premised on their own conduct and knowledge as set forth in preceding paragraphs, not on an assumed agreement among all defendants.

282. Plaintiff further alleges that the discriminatory motivation underlying Defendants Manchester's and Thrall's enforcement actions is evidenced by statements made during the April 2025 inspection of Plaintiff's 73 Walnut Street recovery residence.

283. During that inspection, Defendant Thrall expressly stated that he did not want a facility "like this" in Manchester, while an accompanying Manchester Building Department official stated that a bedroom configuration requiring passage through one bedroom to reach another would be permissible for members of a family but impermissible for Plaintiff's residents because they were unrelated.

284. These contemporaneous statements, made with knowledge that the premises housed individuals recovering from substance-use disorders, provide direct factual support for an inference that the officials' objections were motivated, at least in part, by the disability related character of Plaintiff's recovery residence rather than solely by neutral building or fire-safety considerations.

285. Plaintiff further alleges that the subsequent inspections, restrictions on bedroom occupancy, threats of enforcement, and increased inspection demands at her Cedar Street and Birch Street recovery residences reflected a continuation of the discriminatory treatment first manifested at Walnut Street.

286. These actions interfered with Plaintiff's ability to make housing available to individuals with disabilities and denied those individuals an equal opportunity to use and enjoy residential housing, in violation of 42 U.S.C. § 3604(f).

287. Hartford knowingly restricted an established recovery residence from approximately eight residents to three unrelated occupants, after previously inspecting and approving the premises for recovery housing. Hartford subsequently relied upon a licensing requirement it acknowledged was inapplicable. These actions made housing unavailable to persons with disabilities and substantially interfered with their ability to reside together in a supportive recovery environment.

288. ABH, despite its knowledge of Plaintiff's established recovery housing operations, occupancy records, and Manchester's September 2, 2025 closure letter, continued to suspend new BHRP admissions. Plaintiff alleges that ABH's actions, taken with knowledge of the disability-related nature of the housing, substantially interfered with making such housing available.

**COUNT TWO — FAIR HOUSING ACT REASONABLE ACCOMMODATION (42 U.S.C. § 3604(f)(3)(B)) (CITY OF HARTFORD)**

279. Plaintiff incorporates paragraphs 1–278 as if fully set forth herein.

280. Plaintiff alleges that Hartford was informed of the recovery housing purpose and asked to allow residents to remain while the use and permit requirements were evaluated.

281. The City of Hartford refused to consider a tailored accommodation allowing continued disability related group living consistent with genuine health and safety requirements. The exact accommodation request, necessity, and administrative response require confirmation before filing.

282. Plaintiff requested that Hartford permit the continued occupancy of individuals with disabilities at 510 New Britain Avenue while the City evaluated applicable zoning and licensing requirements and considered alternatives that would preserve the residents' existing supportive housing arrangements. The requested accommodation was necessary to afford persons recovering from substance-use disorders an equal opportunity to use and enjoy the dwelling. Hartford refused the request and instead required the removal of residents and reduction of occupancy, without an individualized determination whether a reasonable accommodation could be granted consistently with legitimate health and safety requirements. Accommodation from the three-unrelated-person restriction was sought by Plaintiff but not granted.

**COUNT THREE — FAIR HOUSNG ACT INTERFERENCE AND RETALIATION (42 U.S.C. § 3617) (TOWN OF MANCHESTER, THRALL, CITY OF HARTFORD AND ABH)**

279. Plaintiff incorporates paragraphs 1–278 as if fully set forth herein.

280. Plaintiff engaged in protected opposition to alleged housing discrimination and alleges that identified recipients knew of her complaints before imposing or maintaining restrictions.

281. Plaintiff alleges inspections, threats, occupancy restrictions and admissions limitations were motivated at least in part by that protected activity.

2382 Defendants engaged in Interference through its inspections, intimidation, displacement, admissions restrictions, and cross-jurisdictional communications allegedly interfered with Carroll's provision of protected housing.

283. Defendants also engaged in Retaliation because of Plaintiff's protected conduct.

284. Defendants' challenged conduct occurred after the protected complaints identified in this Complaint, including complaints communicated directly to Thrall and ABH. Plaintiff alleges that the timing, continuation of restrictions after notice, and statements evidencing hostility support an inference of retaliatory motivation.

**COUNT FOUR — ADA TITLE II DISCRIMINATION (42 U.S.C. § 12132)(TOWN OF MANCHESTER AND CITY OF HARTFORD)**

279. Plaintiff incorporates paragraphs 1–278 as if fully set forth herein.

280. The municipal defendants administered zoning, building and fire enforcement programs and denied disabled residents equal access to those programs through discriminatory treatment and failure to consider a reasonable modification, subject to the specific accommodation facts pleaded above.

281. Municipal services including zoning administration, building and fire code enforcement, occupancy approval, and accommodation procedures resulted in discriminatory administration of those public services and denied persons with disabilities equal access to housing-related municipal services.

282. Plaintiff Carroll, as the owner and operator of A Fortress recovery residences, was herself directly subjected to Defendants' discriminatory administration and enforcement of municipal zoning, building, fire safety, and occupancy requirements because she provided housing to individuals with disabilities. Defendants' actions directly interfered with Plaintiff's ability to operate her established recovery residences, maintain existing residential arrangements, accept new residents, and provide housing-related services to persons recovering from substance use disorders and other disabilities.

283. As a direct and foreseeable result of Defendants' conduct, Plaintiff sustained injuries independent of those suffered by the residents, including the loss of existing and prospective housing revenue, disruption of contractual and business relationships, increased operating expenses, loss of use of residential accommodations, and the forced curtailment or termination of recovery housing operations. Plaintiff asserts these injuries in her own capacity as the operator of A Fortress, arising from Defendants' discriminatory treatment of her because of her association with and provision of housing to individuals with disabilities.

284. Plaintiff was denied equal and nondiscriminatory treatment in the administration of municipal regulatory services and programs that were made available to other residential property owners and operators.

**COUNT FIVE — ADA RETALIATION (42 U.S.C. § 12203) ((TOWN OF MANCHESTER, CITY OF HARTFORD, ADVANCED BEHAVIORAL HEALTH, INC., AND COMMISSIONER NAVARRETTA SOLELY FOR PROSPECTIVE RELIEF)**

279. Plaintiff incorporates paragraphs 1–278 as if fully set forth herein.

280. Plaintiff alleges opposition to disability discrimination, actual notice to the particular recipients identified above, and ensuing adverse actions.

281. The claim against each defendant is limited to conduct supported by that defendant's notice and legally applicable remedial provisions.

282. Navarretta has continuing authority to lift the halt on BHRP new admissions to Plaintiff's remaining recovery residence operations. The continued halt is retaliatory and capable of correction.

**COUNT SIX — EQUAL PROTECTION (42 U.S.C. § 1983)(THRALL AND MUNICIPAL DEFENDANTS)**

279. Plaintiff incorporates paragraphs 1–278 as if fully set forth herein.

2380 Plaintiff alleges intentional disability-based disparate treatment.

281. As to municipal liability, she alleges that officials acting with municipal authority imposed and maintained restrictions and that municipal departments enforced the challenged use classification.

282. Plaintiff alleges that Defendant Thrall and the accompanying Manchester Building Department official, acting under color of state law, intentionally distinguished between traditional family occupancy and occupancy by unrelated individuals residing together in Plaintiff's recovery residences.

283. During the April 2025 Walnut Street inspection, the Building Department official expressly acknowledged that the same bedroom configuration would be acceptable for a family but unacceptable for Plaintiff's residents because they were unrelated, while Thrall simultaneously expressed his opposition to the presence of a facility "like this" in Manchester.

284. Plaintiff alleges that these statements, considered together, support a reasonable inference that the officials' subsequent enforcement decisions were influenced by the disability related

character of Plaintiff's housing operation and not exclusively by legitimate building or fire-safety considerations.

285. Plaintiff further alleges that the subsequent inspections and occupancy restrictions imposed at Cedar Street and Birch Street constituted a continuing pattern of differential treatment of Plaintiff's recovery residences.

286. Plaintiff further alleges that the challenged treatment was not confined to a single isolated statement or inspection. Following the April 2025 Walnut Street inspection, Manchester officials continued to inspect and restrict Plaintiff's recovery residences at Cedar Street and Birch Street, notwithstanding Plaintiff's complaints concerning discriminatory enforcement.

287. Plaintiff alleges that the repetition of these actions across multiple properties, together with the contemporaneous statements of municipal enforcement officials and the Town's subsequent notice of Plaintiff's discrimination complaints, supports an inference of a continuing municipal practice of applying occupancy and enforcement standards more restrictively to recovery residences housing individuals with disabilities.

288. Plaintiff alleges that this practice caused the restrictions upon her properties and the resulting deprivation of equal housing opportunities.

289. To the extent those actions were undertaken because the residences housed persons with disabilities, rather than pursuant to uniformly applied and legally justified standards, they denied Plaintiff and the residents equal protection of the laws in violation of the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.

290. Plaintiff alleges that Defendant Town of Manchester's liability under 42 U.S.C. § 1983 arises not merely from the employment of Defendant Thrall or other municipal personnel, but from the Town's own official enforcement actions, practices, and decisions.

291. The challenged restrictions were implemented through coordinated participation by the Fire Marshal's Office and Building Department, formal violation notices signed by the Assistant Chief Building Inspector, and subsequent official disposition of the enforcement proceedings by the Chief Building Inspector.

292. Plaintiff further alleges that municipal officials continued the challenged course of enforcement after the Town's Mayor received notice of Plaintiff's allegations of disability discrimination on July 31, 2025.

293. Plaintiff alleges that these actions, viewed together with the contemporaneous statements of municipal officials distinguishing traditional family occupancy from occupancy by unrelated recovery-house residents, support an inference that the Town maintained or applied an enforcement practice that treated Plaintiff's disability- elated recovery residences differently from similarly situated residential uses.

294. To the extent the challenged actions resulted from an established municipal custom, an official policy, or decisions attributable to municipal officials possessing final policymaking authority, Plaintiff alleges that such municipal conduct was a moving force behind the deprivation of equal protection of the laws, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

**Unofficial Municipal Custom, Continuing Practice, and Deliberate Indifference ( Town of Manchester)**

295. Plaintiff alleges that the discriminatory enforcement actions challenged herein constituted an unofficial municipal custom or practice of the Town of Manchester, notwithstanding the absence of any formally adopted written policy expressly authorizing discrimination against recovery residences.

292. Beginning in or about April 2025, municipal officials from Manchester's Fire Marshal's Office and Building Department engaged in a continuing course of inspections, enforcement actions, and occupancy restrictions directed toward Plaintiff's recovery residences at Walnut Street, Cedar Street, and Birch Street.

293. During the initial Walnut Street inspection, Defendant Thrall expressly stated his opposition to a facility “like this” in Manchester, while an accompanying Building Department official declared that a particular bedroom configuration would be acceptable for members of a family but unacceptable for Plaintiff's “unrelated” recovery house residents.

294. These statements were followed by additional inspections and enforcement actions at Plaintiff's Cedar Street and Birch Street recovery residences, in which Defendant Thrall continued to participate.

295. The subsequent enforcement actions were not limited to Thrall's individual conduct. Formal Cedar Street violation notices were signed by the Assistant Chief Building Inspector, and the Chief Building Inspector subsequently issued written correspondence officially closing the enforcement case after determining that the required corrections had been made.

296. Plaintiff alleges that these actions demonstrate repeated participation by officials of different municipal departments and supervisory levels in the challenged course of enforcement.

297. On July 31, 2025, Mayor Jay Moran was copied on Plaintiff's CHRO complaint alleging

discriminatory treatment by Manchester officials, thereby providing notice of the nature of Plaintiff's allegations before the subsequent Birch Street inspection.

298. Plaintiff alleges that the Town, through its officials, thereafter had opportunities to examine the allegations of discriminatory enforcement, review the distinction drawn between traditional family occupancy and recovery-house occupancy, and determine whether the challenged practices were consistent with federal constitutional and fair housing requirements.

299. Notwithstanding such notice, Plaintiff alleges that Manchester continued its challenged course of enforcement and, through October 15, 2026, had not, to Plaintiff's knowledge, repudiated the discriminatory occupancy distinction articulated during the Walnut Street inspection or taken meaningful action to remedy the injuries allegedly resulting from the challenged enforcement practices.

300. Plaintiff alleges that the continuation of the challenged practices across multiple properties, their implementation through formal municipal enforcement procedures, the participation of supervisory municipal officials, and the Town's failure to address the alleged discrimination after receiving notice support a reasonable inference that the conduct was sufficiently persistent and accepted to constitute an unofficial municipal custom or practice.

301. Plaintiff further alleges that the Town's continued tolerance of the challenged practices, despite notice of their allegedly discriminatory character and opportunities for corrective action, constituted deliberate indifference to the constitutional rights of Plaintiff and the residents of her recovery residences.

302. Plaintiff alleges that this unofficial municipal custom or practice was a moving force behind the discriminatory enforcement actions, occupancy restrictions, interference with recovery-

housing operations, and resulting injuries alleged herein, in violation of the Equal Protection Clause of the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.

303. Plaintiff alleges that the Town's repeated enforcement actions, implemented through multiple municipal departments and continued after notice to municipal leadership, reflected an established enforcement practice rather than merely the unauthorized conduct of a single employee. The Town's continued application of that practice was a moving force behind the challenged restrictions and resulting injury.

304. Plaintiff alleges that the City of Hartford's coordinated zoning, fire, and building actions, including the September 11 notice and September 12 directive, provide a factual basis to allege an official municipal decision.

**COUNT SEVEN — PROSPECTIVE FEDERAL RELIEF (COMMISSIONER NAVARRETTA, OFFICIAL CAPACITY)**

279. Plaintiff incorporates paragraphs 1–278 as if fully set forth herein. To the extent a DMHAS-directed admissions restriction directed by DMHAS remains in force and violates the FHA or ADA, Plaintiff seeks prospective declaratory and injunctive relief against the Commissioner acting within her authority, without requesting damages against the State.

280. Plaintiff incorporates the preceding factual allegations concerning the continuing suspension of new BHRP admissions and the removal of A Fortress from the publicly available DMHAS recovery housing listing.

281. Plaintiff alleges that these restrictions remain in effect notwithstanding Manchester's written closure of its enforcement case and Plaintiff's continued submission of housing availability information.

282. To the extent Commissioner Navarretta possesses authority to direct, approve, maintain, or terminate these continuing restrictions, Plaintiff alleges that their continued enforcement violates the FHA and/or ADA for the reasons set forth above.

283. Plaintiff seeks prospective declaratory and injunctive relief requiring cessation of any ongoing unlawful discriminatory or retaliatory restrictions, reconsideration of admissions eligibility under lawful nondiscriminatory standards, and restoration of access to applicable referral processes where legally warranted.

284. Plaintiff alleges that the continuing suspension of new BHRP admissions is not merely a completed consequence of the July 2025 inspections but constitutes a present and ongoing restriction upon participation in the recovery housing program. Notwithstanding the closure of Manchester's identified enforcement case, the restriction has continued for more than one year, and Plaintiff alleges that its continuation is discriminatory or retaliatory for the reasons set forth herein.

**COUNT NINE- TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS RELATIONSHIPS (ROGER THRALL, INDIVIDUAL CAPACITY)**

279. Plaintiff Christine Carroll incorporates paragraphs 1 through 278 of this First Amended Complaint as though fully set forth herein.

280. At all relevant times, Carroll maintained contractual and beneficial business relationships with residents who paid for housing and supportive services at her A Fortress recovery residences, and established relationships with agencies and program administrators through which eligible residents were referred, placed, and financially supported.

281. These relationships included existing paying residents and the reasonable expectation of

continued occupancy, payments, and additional placements arising from Carroll's established operation of recovery residences in Manchester and Hartford.

282. Defendant Roger Thrall knew of these relationships through his inspections, interactions with Carroll and her residents, and communications with ABH, DMHAS, and Hartford officials concerning Carroll's recovery housing operations. Thrall was not a party to Carroll's agreements with her residents or to her recovery housing funding and placement agreements.

283. In April 2025, while standing with Carroll at her 73 Walnut Street recovery residence, Thrall directly expressed hostility toward her recovery housing operation by stating that he did not want a facility "like this" in Manchester. The premises housed persons recovering from substance use disorders and other persons with disabilities, and Thrall knew the nature of that use.

284. During that visit, Thrall asserted that twenty persons resided at Walnut Street, repeatedly pressed residents to confirm that assertion, suggested Carroll might have removed occupants before his arrival, and stated that he would return. Carroll denied the asserted occupancy and provided information inconsistent with it, including the property's low water consumption.

285. Manchester officials also restricted the use of rooms and storage at Walnut Street and stated that the questioned arrangement would have been acceptable if its occupants were a family.

286. Carroll placed the property on the market during the same week because she feared continued enforcement harassment, and disruption, and subsequently sold it.

287. Thrall thereafter demonstrated his awareness that Carroll had relinquished the Walnut Street operation by commenting during the Birch Street inspection that she no longer had to worry about Walnut Street.

288. Upon information and belief, having observed that the enforcement pressure caused Carroll to cease operating that residence, Thrall continued and expanded similar pressure against her remaining recovery residences for the purpose of disrupting their operation.

289. After Carroll complained of disability discrimination and notified Thrall of her complaints, Thrall conducted further unannounced inspections at Cedar Street. Manchester personnel restricted the use of third-floor rooms, including rooms Carroll alleges were lawful bedrooms, and threatened arrest or criminal prosecution in connection with access and the removal of posted notices.

290. During the August 6, 2025 Birch Street inspection, Thrall asked Carroll, “so how is your Hartford location doing?” Carroll had no obligation, in connection with his inspection of her Manchester property, to report on her separate Hartford operation. His unsolicited inquiry demonstrated knowledge of that operation beyond the Manchester premises he was inspecting.

291. Thrall communicated allegations concerning Carroll’s occupancy and use of her recovery residences to ABH and, through ABH, to DMHAS. He also communicated with Hartford officials concerning alleged overcrowding at Carroll’s Hartford residence when he had no reason to know of any such overcrowding.

292. Upon information and belief, Thrall knowingly conveyed materially false allegations that Carroll was operating overcrowded recovery residences and had moved residents from Cedar Street to Hartford under circumstances warranting further enforcement.

293. Carroll’s occupancy records contradicted those accusations and, following the Cedar Street restrictions, one resident moved to Birch Street while the remaining residents stayed at Cedar Street.

294. The allegations of knowing falsity are supported by Thrall's personal inspections and observations, Carroll's explanations concerning stored furniture and renovations, her denial of the asserted occupancy, and the discrepancy between his reported account of transfers to Hartford and the resident movements Carroll describes. Carroll further alleges that Thrall sought confirmation of his accusations through suggestive questioning rather than a review of available contemporaneous occupancy records.

295. Thrall's communications were intended to induce ABH, DMHAS, and Hartford officials to restrict Carroll's operations and thereby interfere with her existing resident relationships and established sources of placements and associated revenue.

296. Following the Manchester's referral by Thrall, the City of Hartford undertook inspections and imposed restrictions culminating in directions that residents leave the Hartford recovery residence. Carroll alleges that four paying residents formerly displaced from Walnut Street were among the Hartford residents she lost, causing the loss of their housing payments and impairing her ability to meet operating expenses.

297. On September 12, 2025, ABH, after consultation with DMHAS, halted new BHRP admissions to Carroll's Manchester recovery residences. Continued admissions were thereafter conditioned on documentation concerning Manchester's fire-code and other compliance concerns.

298. Although Manchester's September 2, 2025 correspondence, identified by Carroll as the September 2, 2025 clearance letter, represented that the violations had been corrected and the case closed, Carroll was unable to obtain the definitive written clearance requested from Thrall and the Town of Manchester to resolve the continuing restrictions placed by ABH/DMHAS on her business.

299. Upon information and belief, Thrall personally participated in refusing or obstructing the definitive clarification or supplemental clearance Carroll sought, notwithstanding the Town's written representation that the violations had been corrected and its case closed. His participation is alleged based on his direct involvement in the inspections, his communications with ABH and Hartford, and his continuing participation in correspondence concerning the Manchester enforcement matters.

300. Upon information and belief, Thrall knew from his communications with ABH and the agencies administering Carroll's placements that unresolved Manchester compliance accusations would jeopardize further admissions and associated payments. His refusal to resolve or correct the continuing effect of those accusations was intended to prolong that interference.

301. As of the filing of this Amended Complaint, Carroll has not been informed that the restriction on new BHRP admissions has been lifted. She alleges that the absence of definitive Thrall/Manchester clearance has contributed to the continuation of that restriction and the resulting loss of new placements and associated payments.

302. Thrall's conduct was undertaken with an improper discriminatory and retaliatory motive and through improper means, including knowingly false factual reports, intimidation, and the use of municipal enforcement authority to disrupt Carroll's relationships with residents and placement sources. His conduct was motivated by hostility toward her recovery housing operations and her opposition to discrimination, rather than a good-faith effort to secure compliance with legitimate safety requirements.

303. As a direct and proximate result of Thrall's intentional interference, Carroll lost paying residents, reasonably expected placements, rental and program income, and the use of available

housing capacity; incurred relocation and additional operating expenses; and suffered impairment of her established recovery housing business. The interference also prevented her from using available Manchester placements to accommodate residents displaced from Hartford.

304. Thrall's conduct was willful and malicious and undertaken with the intent to injure Carroll's business. Carroll seeks to hold him personally liable for his own intentional misconduct.

305. Thrall's false reports and communications were a substantial factor in causing ABH and DMHAS to restrict new placements and in precipitating Hartford's investigation and subsequent enforcement actions. Plaintiff alleges that these consequences were foreseeable and intended results of Thrall's conduct.

306. Plaintiff alleges that, after the identified violations were reported corrected and the enforcement case closed, Thrall knowingly failed to correct materially misleading compliance accusations that he had communicated to third parties, notwithstanding notice that those accusations continued to disrupt Plaintiff's established business relationships.

307. Carroll therefore seeks compensatory damages for the losses caused by Thrall's tortious interference, punitive damages to the extent permitted by Connecticut law, allowable costs, and such further relief as the Court deems appropriate.

## X. PRAYER FOR RELIEF

Plaintiff requests:

(a) declarations of federal rights and violations proved;

(b) appropriate prospective injunctive relief against continuing unlawful restrictions, including consideration of lawful reasonable accommodations;

(c) compensatory damages against defendants legally subject to such relief, proved without duplication;

(d) allowable fees and costs under 42 U.S.C. §§ 3613(c)(2), 12205, and 1988 where applicable; and

(e) such further relief as is just and lawful.

Respectfully submitted,
THE PLAINTIFFS
BY:*<u>/s/Josephine Smalls Miller</u>*

Josephine Smalls Miller, Fed Bar #ct23079
130 Deer Hill Avenue, Unit 13
Danbury, CT. 06910
Tel: (203) 512-2795
Email: jsmillerlaw@gmail.com

**CERTIFICATION**

This is to certify that the foregoing First Amended Complaint was filed on October 16, 2026. All parties may access this filing through the Court's CM/ECF system.

*<u>/s/ Josephine Smalls Miller</u>*
Josephine Smalls Miller